**Lee L. GRANTHAM, Plaintiff–Appellant,**

**v.**

**Myrna E. TRICKEY, Director; Randee Kaiser, Missouri Sexual Offender Program Director; Jeannie Thies, previously Jeannie Schneider; and Dale Riley, Defendants–Appellees.**

**No. 93–1143.**

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 11, 1993.

Decided April 12, 1994.

290

Larry M. Schumaker, Kansas City, MO, argued, for appellant.

Gary L. Gardner, Asst. Atty. Gen., Jefferson City, MO, argued, for appellee.

Before BOWMAN, Circuit Judge, JOHN R. GIBSON,* Senior Circuit Judge, HANSEN, Circuit Judge.

HANSEN, Circuit Judge.

Lee L. Grantham appeals the district court's[1] order granting summary judgment to the defendants on his 42 U.S.C. § 1983 First Amendment wrongful discharge claim. Grantham claimed he was discharged from his job in the Missouri Sex Offender Program ("MOSOP") in retaliation for criticizing the operation of the program. The district court held that the defendants were entitled to qualified immunity on Grantham's First Amendment damages claim and denied equitable relief as being inappropriate on the facts of this case. We affirm.

I.

Grantham was hired as a Caseworker I for MOSOP in June of 1988, a position carrying a six-month probationary period. He was promoted to a Caseworker II position in October of 1988, a position also carrying a

* The HONORABLE JOHN R. GIBSON was an active judge of this court at the time this case was submitted and took senior status on January 1, 1994.

1. The Honorable Scott O. Wright, United States District Judge for the Western District of Missouri.

six-month probationary period. He worked with "Phase I" of MOSOP. His immediate supervisor was defendant Jeannie Thies (formerly known as Jeannie Schneider). Thies' supervisor was defendant Randee Kaiser, the director of MOSOP. Kaiser reported to defendant Myrna Trickey, then director of the Division of Classification and Treatment. Defendant Dale Riley succeeded Trickey as the director of Classification and Treatment.

At a staff meeting in October 1988, Grantham began voicing his concerns about the way "Phase II" of MOSOP functioned and the way inmates were being treated. While Grantham had never worked with Phase II of the program, he claimed he had heard that inmates in Phase II were being verbally abused by staff members. Grantham brought these concerns to Kaiser's attention in a memo dated October 31, 1988. He also alleged in that memo that Thies had begun retaliating against him because of his complaints about Phase II of MOSOP. He continued to voice those concerns at points throughout his employment in MOSOP.

On November 28, 1988, Grantham filed a formal grievance against Thies alleging, among other things, that she was retaliating against him for his criticisms of Phase II. (R. at 428–30.) He specifically noted that his criticisms had caused a controversy and that many therapists strongly opposed his stated position on Phase II. His grievance specifically requested that Phase I of the program be reassigned to Kaiser instead of Thies. Kaiser denied the grievance on November 30, 1988. (R. at 431–33.)

On December 2, 1988, Grantham wrote to Kaiser noting that Kaiser had improperly denied the grievance before Thies had responded.[2] Grantham concluded with a statement that if he did not request a further proceeding by January 10, 1989, the matter should be considered resolved. Thies, Kaiser, and Grantham, however, continued to meet to attempt to resolve the issues.

On January 5, 1989, Grantham wrote Trickey to complain about the way Kaiser and Thies had handled his grievance. (R. at 439–40.) He specifically requested a transfer, stating that he did not think he could continue to work with Thies. On January 10, 1989, Trickey directed Kaiser, with the help of a personnel officer, to conduct a formal hearing on Grantham's grievance. Grantham wrote back to Trickey attempting to waive the hearing and filing a supplement to his original grievance. (R. at 445–48, 461.) Trickey denied Grantham's attempt to waive the hearing and instructed him to continue in the process of scheduling a hearing. (R. at 460.) The hearing on Grantham's grievance was scheduled for three different occasions, but the hearing never took place. Grantham was sick on two occasions, and he declined to proceed on the other occasion.

In a memo dated January 24, 1989, Grantham communicated his criticisms of Phase II of MOSOP to Trickey. (R. at 360.) Grantham specifically complained that Thies over-assigned inmates to Phase II therapy groups and that group therapists were being forced to eliminate arbitrarily up to half of the inmates to get their groups to a manageable size. Grantham alleged that Thies pressured the therapists to eliminate group members to accomplish this goal. Both Trickey and Kaiser investigated and responded to Grantham's concerns.

In a March 5, 1989, memo, Kaiser advised Trickey to deny Grantham's November 1988 grievance. (R. at 771.) In a March 6, 1989, memo, Kaiser requested Trickey to authorize Grantham's termination. (R. at 762–66.) Kaiser noted that Grantham's work performance was not satisfactory. Kaiser also stated that Grantham had been a problem and that his continued employment as a caseworker in MOSOP would risk both morale problems and the program's reputation with the Department of Corrections and the inmates. A member of Trickey's staff investigated Kaiser's request. That staff member talked only to Kaiser.

On March 7, 1989, Trickey denied Grantham's November 1988 grievance. (R. at 481.) Trickey found that Grantham had been given three opportunities for a grievance hearing and had been absent for each one. After Grantham received notice of the

---

**2.** The parties agree now that Kaiser should have allowed Thies to respond to the grievance first.

denial of the grievance, he called Kaiser at home on a Friday evening to discuss further his concerns about MOSOP. Grantham recorded the call without Kaiser's knowledge and had a transcript of the conversation made. (R. at 485–87.) Grantham told Kaiser that he wanted to get "[t]he whole office [to] move ahead into doing something beside [sic] all the problems that we have been having." (*Id.* at 485.) Kaiser responded angrily and complained about Grantham's repeated criticism of the program and the increasingly disloyal tone of his criticism. Kaiser told Grantham not to call him at home anymore.

On March 9, 1989, Trickey wrote a letter to Grantham formally terminating his employment. (R. at 816.) At the time of his termination, Grantham had approximately two weeks remaining in his six-month probationary period of employment.

Grantham filed this action alleging that Thies, Kaiser, and Trickey violated his First Amendment rights by harassing him and eventually discharging him because he voiced his concerns about Phase II of MOSOP. He also asserted that defendants Riley and Trickey violated his due process rights by failing to provide pretermination or posttermination review. Grantham sued Thies, Kaiser, and Trickey in their individual capacities and all the defendants in their official capacities for both money damages and equitable relief.

The district court granted defendants' motion for summary judgment. The district court held that the defendants had Eleventh Amendment immunity as to the suit against them in their official capacity. The district court then held that the defendants were entitled to qualified immunity as to the suit against them in their individual capacities.

Grantham filed a motion requesting the district court to alter or amend its decision granting summary judgment on his First Amendment claim. He argued that the district court erred in holding the suit against the defendants in their individual capacity was barred by qualified immunity. He also argued that the district court erred in granting

ing summary judgment on the suit against the defendants in their official capacities because they do not have immunity from his claim for equitable relief against them in their official capacities. The district court denied Grantham's motion to alter or amend the summary judgment order and specifically found that equitable relief was not appropriate in this case. Grantham appeals the district court's decision granting summary judgment on his First Amendment wrongful discharge claim and argues that the district court erred in granting the defendants qualified immunity in their individual capacity and in denying his claim for equitable relief against them in their official capacity.

## II.

"[I]t has been settled that a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression," *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983). In the context of public employment, however:

> this First Amendment right is not absolute. If a public employee has been disciplined for engaging in protected speech, whether that discipline violated the First Amendment requires a careful balance of "the interests of the [employee], as a citizen, commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."

*Bartlett v. Fisher,* 972 F.2d 911, 916 (8th Cir.1992) (quoting *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968) (alteration in original)).

The district court granted the defendants' motion for summary judgment on Grantham's First Amendment claim, concluding the defendants were entitled to qualified immunity.[3] "[P]ublic officials are entitled to qualified immunity when their 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable

---

**3.** We will assume, *arguendo,* that Grantham was speaking on a matter of public concern and turn

to the critical question of whether the district court was correct in granting qualified immunity.

person would have known.'" *Id.* at 914 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). "A right is 'clearly established' for qualified immunity purposes if '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand ·that what he is doing violates that right.'" *Swenson v. Trickey,* 995 F.2d 132, 133 (8th Cir. 1993) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (alterations in original)).

■ Our cases recently have reached different conclusions on the· question of when an individual's right to free speech in public employment is "clearly established" for the purposes of qualified immunity. We have held that "when *Pickering's* fact-intensive balancing test is at issue, the asserted First Amendment right 'can rarely be considered "clearly established" for purposes of the *Harlow* qualified immunity standard.'" *Buzek v. County of Saunders,* 972 F.2d 992, 997 (8th Cir.1992) (quoting *Bartlett v. Fisher,* 972 F.2d 911, 916 (8th Cir.1992)). We also have recently held, however, (without reference to either *Buzek* or *Bartlett* ) that "[n]o right is more clearly established in our republic than freedom of speech." *Casey v. City of Cabool,* 12 F.3d 799, 804 (8th Cir. 1993). We added that it is " 'clearly established that a State may not discharge an employee on a basis that ·infringes that employee's constitutionally protected interest in freedom of speech.'" *Id.* (quoting *Rankin v. McPherson,* 483 U.S. 378, 388, 107 S.Ct. 2891, 2899, 97 L.Ed.2d 315 (1987)); *see also Duckworth v. Ford,* 995 F.2d 858, 861 (8th Cir.1993) (concluding without reference to *Bartlett* or *Buzek* that defendant "not entitled to qualified immunity because the law was clearly established in 1988 that public employers could not retaliate against public employees for engaging in ·protected speech or activity"). We must first determine which of these standards will control our determination of whether Grantham's First Amendment right of free speech in the course of his public employment was clearly established.

The district court applied the analysis set out in *Bartlett* and *Buzek.* In *Bartlett,* the plaintiff, a Missouri Highway Patrol officer, alleged that he was fired in violation of his First Amendment free speech rights for writing a letter to the Governor complaining that Highway Patrol work standards and policies were really nothing more than a ticket-writing quota system. In reversing the district court's refusal to grant qualified immunity to the Highway Patrol officials involved in the firing, we employed the following reasoning:

> The· qualified nature of this constitutional right must be considered in determining whether the individuals who imposed the discipline are entitled to qualified immunity . . . .

> · At least five circuits have concluded that because *Pickering's* constitutional rule turns upon a fact-intensive balancing test, it can rarely be considered "clearly established" for purposes of the *Harlow* qualified immunity standard . . . .

> . . . "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341 [106 S.Ct. 1092, 1096, 89 L.Ed.2d 271] (1986). To provide that ample protection in this context, the employer's justification for the discipline must be taken into account in determining whether the . defendants' conduct was objectively unreasonable, that is, whether "no reasonably competent officer would have concluded" that the discipline could be imposed without violating the employee's First Amendment rights. *Id.*

*Bartlett,* 972 F.2d at 916–17. In applying this particularized standard to the facts, we determined in *Bartlett* that "[i]n support of their motion for summary judgment, defendants placed the *Pickering* balancing test squarely at issue by presenting evidence that Bartlett's letter to the Governor had an adverse impact on the Patrol." *Id.* at 917. We then determined that the letter affected the efficiency of the operation of the Patrol because it affected the morale of the Patrol and damaged its reputation. *Id.* We concluded that the officer's right of free speech was not clearly established and that the defendants were entitled to qualified immunity. *Id.* at 917–18. The district court in this case relied

on *Bartlett* in finding qualified immunity for the defendants.

In *Buzek,* a deputy sheriff who "constantly criticized the practices and policies" of the sheriff's department was fired after he wrote a letter to a judge in another county on behalf of a criminal defendant that was appearing before the judge for sentencing. 972 F.2d at 994. We reiterated the exact same standards we laid out in *Bartlett* but went on to conclude that qualified immunity was not appropriate, stating:

> Nevertheless, we reject [defendant's] claim of qualified immunity. Buzek's letter unquestionably dealt with a matter of public concern. As we have explained, defendants failed to introduce at trial any evidence that would justify, under *Pickering's* balancing test, their decision to punish Buzek for his speech. Thus, the record here is like that in *Powell v. Basham,* 921 F.2d 165, 168 (8th Cir.1990), where we affirmed the denial of a motion for summary judgment on qualified immunity grounds because plaintiff's right to comment on matters of public concern was clearly established and "[d]efendants have not yet produced any evidence to show that Powell's criticisms adversely affected the efficiency of the department."

*Buzek,* 972 F.2d at 997. The district court found *Buzek* distinguishable because the defendants produced evidence that Grantham's speech impaired the efficiency of MOSOP. In both *Bartlett* and *Buzek,* we pointed out that in deciding whether the free speech right is clearly established, it is critical to determine whether the defendants have put the *Pickering* balancing test at issue by producing evidence that the speech activity had an adverse effect on the efficiency of the public employer's operations.

In *Duckworth,* which we decided after the district court rendered its decision in this case, an officer in the Missouri Highway Patrol filed a 42 U.S.C. § 1983 suit against his superintendent, alleging the superintendent had taken retaliatory action resulting in the officer's constructive discharge from employment. 995 F.2d at 860. The officer, Duckworth, alleged that the superintendent took the retaliatory action against Duck-

worth because Duckworth had supported another candidate for the superintendent position. In reviewing the superintendent's assertion of qualified immunity, we held, without citing *Bartlett* or *Buzek,* that the superintendent "was not entitled to qualified immunity because the law was clearly established in 1988 that public employers could not retaliate against public employees for engaging in protected speech," and we determined that Duckworth's support of the other candidate was protected speech. *Id.* at 861. We made no mention of any evidence that Duckworth's support of the other candidate for superintendent disrupted or in any way affected the operation of the Missouri Highway Patrol.

Similarly, in *Casey,* which we also decided after the district court rendered its decision in this case, a city employee was discharged for making private statements critical of city policies and city officials. The city employee, Casey, made these statements in a private conversation with the city administrator. The city administrator then related Casey's statements to the mayor and eventually to the city council, telling them that Casey had no right to question city policy and that "to do so was unacceptable, insubordinate, and disloyal." 12 F.3d at 802. The city council subsequently authorized Casey's termination. *Id.* Casey sued the city council members under 42 U.S.C. § 1983, alleging that they discharged him in violation of his free speech rights. The jury found for Casey and awarded him damages. We first addressed the merits of his free speech claim and concluded that under the *Pickering* balancing test, Casey had a substantial interest in commenting on the city policies and city officials, while the city's interest in efficient and effective government was unaffected by Casey's remarks. *Id.* at 803–04. We then addressed the city council members' assertion of qualified immunity and concluded that qualified immunity was not appropriate because Casey's right of free speech was clearly established. *Id.* at 804. While we did not cite either *Bartlett* or *Buzek,* we did earlier note in the analysis of the merits that Casey's speech in no way affected the efficient operation of the city. *Id.* at 803–04.

In this case, we will follow the analysis of qualified immunity laid out in *Bartlett* and *Buzek*. In particular, we rely on *Bartlett* because it is factually the closest to the case before us. Like *Bartlett*, the defendants here have produced evidence showing that Grantham's criticisms of MOSOP adversely affected the efficiency of MOSOP's operation. In Kaiser's March 6, 1989, memo to Trickey requesting Grantham's dismissal, Kaiser specifically stated that "Mr. Grantham's continued exposure to MOSOP in his position as a Caseworker now constitutes a risk to staff morale, the program's reputation ..., and to the inmates with whom he has contact." (R. at 819.) Kaiser noted that the repeated complaints about Phase II had nothing to do with Grantham's own job and should be viewed as Grantham's attempts to discredit his supervisor, Ms. Thies, who had responsibilities for implementing the program. (R. at 823.) Kaiser concluded that Grantham's "continued presence in MOSOP ... does not contribute to a healthy and productive working atmosphere, and furthermore serves to destabilize staff morale." (R. at 823). Kaiser's deposition testimony also characterized Grantham's constant criticisms of MOSOP as being denigrating to the program and demeaning to other employees (including Thies) who were trying to make it work. (R. at 734.)

Moreover, Grantham himself specifically recognized in his November 28, 1988, grievance that his criticisms of the program had caused a controversy within the staff and that many therapists within the program strongly opposed his stated position. (R. at 429.) As evidence of this strong opposition, he stated that he was cursed by one of the Phase II therapists. (*Id.*) Likewise, in his taped telephone conversation with Kaiser, Grantham acknowledged his disruptiveness by stating that he wanted to get "[t]he whole office [to] move ahead into doing something beside [sic] all the problems that we have been having." (R. at 485.)

A public employee's exercise of free speech rights affects the efficiency of the operation of the public service when it affects the morale of the work force and damages the program's reputation. *Bartlett*, 972 F.2d at 917; *see also Rankin v. McPherson*, 483 U.S. 378, 388, 107 S.Ct. 2891, 2899, 97 L.Ed.2d 315 (1987) (considering under *Pickering* test "whether the statement impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidences are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise"). The foregoing evidence links Grantham's criticisms of the program to problems with his supervisor, his work performance, staff morale, and the functioning of the entire operation. We conclude that under *Bartlett*, the record supports the district court's conclusion that Grantham's free speech rights were not "clearly established" and, therefore, the defendants were entitled to qualified immunity. We affirm that conclusion.[4]

## III.

Grantham also argues that the district court erred in denying his equitable claim for reinstatement. There is no dispute that qualified immunity does not apply to claims for equitable relief, *Stanley v. Magrath*, 719 F.2d 279, 284 n. 9 (8th Cir.1983), and that state officials may be sued in their official capacity for equitable relief, *see Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 n. 10, 109 S.Ct. 2304, 2311 n. 10, 105

---

**4.** Our decision will not allow public employers to fire employees for legitimate free speech activity and receive the cover of qualified immunity by simply asserting the exercise of free speech rights affected morale. We first point out that the plaintiff employee is free to produce countervailing evidence that there was no affect on morale to create a question of fact on that issue. *See Gainor v. Rogers*, 973 F.2d 1379, 1385 (8th Cir. 1992) ("Once a genuine issue of material fact is found to exist, the defense of qualified immunity shielding the defendant from trial must be denied."). Grantham failed to introduce any such countervailing witnesses or evidence that his exercise of free speech rights did not cause morale problems or disrupt the operation of MOSOP. Moreover, we do not hold that a simple assertion by the employer that the speech activity affected morale is enough to support a grant of qualified immunity. Here, we have specific and unrefuted evidence that Grantham's criticisms of the program affected morale and substantially disrupted the work environment.

L.Ed.2d 45 (1989). The district court concluded, however, that equitable relief nevertheless would be inappropriate in this case for three reasons: (1) Grantham was only a probationary employee and at best could only be reinstated for the remainder (two weeks) of his original six-month probationary term; (2) that there is evidence of hostility between Grantham and the defendants; and (3) that Grantham did not want the same job back but instead wanted to be transferred to another site.

■ The fact that Grantham was a probationary employee makes no difference as to whether he can seek reinstatement. As Grantham points out, the Supreme Court specifically stated that:

> Even though [plaintiff] was merely a probationary employee, and even if she could have been discharged for any reason or for no reason at all, she may nonetheless be entitled to reinstatement if she was discharged for exercising her constitutional right to freedom of expression.

*Rankin*, 483 U.S. at 383–84, 107 S.Ct. at 2896–97. Hence, the district court's first reason for finding equitable relief unavailable is not persuasive.

■ However, when "there is 'evidence of extreme animosity between plaintiffs and defendant employers,'" the trial judge may find that reinstatement is not the appropriate remedy. *Williams v. Valentec Kisco, Inc.*, 964 F.2d 723, 730 (8th Cir.1992) (quoting *Dickerson v. Deluxe Check Printers, Inc.*, 703 F.2d 276, 281 (8th Cir.1983)). This hostility must go beyond the normal hostility between parties to litigation. *See Brooks v. Woodline Motor Freight, Inc.*, 852 F.2d 1061, 1065 (8th Cir.1988). We conclude that an unacceptable level of hostility would continue to exist if the court ordered Grantham reinstated.

■ Thies is still employed by MOSOP, and Grantham acknowledges that he would be required to report to Thies if he were

reinstated. Kaiser has characterized Thies as "the person with whom [Grantham] had the most bitter conflicts." (R. at 755.) Grantham repeatedly charged Thies with discriminating and retaliating against him and specifically stated in his January 5, 1989, memo to Trickey that "it is clear to me that I will not be able to work with Ms. [Thies]." (R. at 847.) Contrary to Grantham's assertion, Thies has nowhere in the record stated that she has "put everything behind her." She stated only that she could not recall how she felt upon learning that Grantham had been dismissed. (R. at 613.) This evidence provides more than sufficient indication that reinstatement is not appropriate in this case.[5] Hence, there was no error in granting summary judgment on Grantham's claims against the defendants in their official capacity.

## IV.

The district court committed no error in granting summary judgment to the defendants on Grantham's 42 U.S.C. § 1983 claim alleging unlawful discharge in violation of his First Amendment free speech rights. The defendants were entitled to qualified immunity in the suit against them in their individual capacities, and the suit for equitable relief against the defendants in their official capacity is not supported by the factual record in this case. Accordingly, we affirm the judgment of the district court.

---

5. When reinstatement is not feasible, the court may grant front pay as an alternative equitable remedy. *See Standley v. Chilhowee R–IV Sch. Dist.*, 5 F.3d 319, 322 (8th Cir.1993). Grantham, however, did not request front pay as an alternative equitable remedy in this case and acknowl-

edges in this appeal that it probably is barred by the Eleventh Amendment. *Cf. Williams*, 964 F.2d at 730 (no requirement that party need to request front pay to have it addressed so long as reinstatement is raised).