324 F.Supp.2d 1048 (2004)
Carissa COLEMAN, et al., Plaintiffs,
v.
BOARD OF EDUCATION OF THE CITY OF ST. LOUIS, Defendant.
No. 4:02-CV-1712 CAS.
United States District Court, E.D. Missouri, Eastern Division.
June 30, 2004.
*1049 *1050 James Hetlage, Lashly & Baer, P.C., St. Louis, MO, for defendant.

MEMORANDUM AND ORDER
SHAW, District Judge.
This matter is before the Court on defendant Board of Education of the City of St. Louis' (the "Board") motion for summary judgment. Plaintiffs oppose the motion. *1051 For the following reasons, the Court will deny the motion with respect to Count I and grant the motion with respect to Count II.

Background.
Plaintiffs were formerly employed by the Board through the St. Louis Public School District (the "District") as Speech Language Implementors and later as Speech Language Pathologists. Plaintiffs bring this action against the Board asserting two claims under 42 U.S.C. § 1983. In Count I, plaintiffs assert that the Board violated their First Amendment rights by refusing to renew their employment contracts in retaliation for their conduct in challenging the propriety of the District's conduct in reassigning them from Speech Language Implementor to Speech Language Pathologist positions, as they were not qualified to perform the latter. In Count II, plaintiffs assert that the Board violated their rights under the Substantive Due Process Clause of the Fourteenth Amendment when it engaged in a pattern of arbitrary and capricious conduct including its demand that they work as Speech Language Pathologists, which they could not do without violating state law.

Legal Standard.
The standards applicable to summary judgment motions are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
The initial burden is placed on the moving party. City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc., 838 F.2d 268, 273 (8th Cir.1988) (the moving party has the burden of clearly establishing the non-existence of any genuine issue of fact that is material to a judgment in its favor). Once this burden is discharged, if the record shows that no genuine dispute exists, the burden then shifts to the non-moving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on a material factual issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
Once the burden shifts, the non-moving party may not rest on the allegations in its pleadings, but by affidavit and other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed.R.Civ.P. 56(e); Herring v. Canada Life Assur. Co., 207 F.3d 1026, 1029 (8th Cir.2000); Allen v. Entergy Corp., 181 F.3d 902, 904 (8th Cir.), cert. denied, 528 U.S. 1063, 120 S.Ct. 618, 145 L.Ed.2d 512 (1999). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A dispute about a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Herring, 207 F.3d at 1029 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

Facts.
The Missouri Healing Arts Practices Act, Mo.Rev.Stat. §§ 345.010 (2000) (the "Act"), regulates and defines the practice of Speech Language Pathology. The practice of this field includes screening, identifying, diagnosing and treating disorders of speech, language, and cognitive and social aspects of communication. Mo.Rev.Stat. § 345.015(9). The Act requires persons working as Speech Language Pathologists to be licensed by the State Board of Healing Arts Registration, Mo.Rev.Stat. *1052 § 345.020.1, and sets out criteria which must be met before a person can be licensed as a Speech Language Pathologist, which include holding a master's degree in the field. Mo.Rev.Stat. § 345.050(1). It is a class B misdemeanor to perform the duties of a Speech Language Pathologist in Missouri without a valid license. Mo.Rev.Stat. §§ 345.020.2, 345.075.
The Act contains an exception to the licensing requirement if the practitioner holds a valid certificate issued by Missouri's Department of Elementary and Secondary Education ("DESE") and practices speech language pathology only within the context of her employment with a school district. Mo.Rev.Stat. § 345.025(b). The DESE's requirements for certifying a Speech Language Pathologist are that the candidate either hold a license issued by the State Board of Healing Arts Registration or meet a set of criteria which includes a master's degree. Pls.' Ex. 2.
The Individuals with Disabilities Education Act, 20 U.S.C. § § 1400-1491o ("IDEA"), requires school districts such as the District to provide special education services to students with disabilities, including speech and language services. The District's Speech and Language Department (the "Speech Department") offers services including screening students for speech and language disorders, diagnosing such disorders, developing Individualized Education Plans ("IEPs") for students, and providing special education and therapy in conformance with the IEP. Ms. Mabel Brown is the head of the Speech Department.
The District employs both Speech Language Pathologists and Speech Language Implementors in the Speech Department. The role of the Speech Language Implementor is to implement the IEPs, typically by providing speech or language therapy to students. In contrast, the Speech Language Pathologist occupies the "decision making" role of screening and diagnosing students, developing IEPs, and communicating with the students' parents and teachers. Speech Language Implementors must be supervised by a fully qualified Speech Language Pathologist. The District uses Speech Language Implementors to address its ten-year shortage of Speech Language Pathologists.
Plaintiffs Carissa Coleman and Deanna Scanlon each graduated from college with a Bachelor of Science degree in Communication Science and Disorders; Ms. Coleman in December 1998 and Ms. Scanlon in May 1999. In August 1999, plaintiffs began working for the District as Speech Language Implementors. In early 2000, plaintiffs began working toward their master's degrees through a Distance Education in Communication Sciences and Disorders program offered by Southwest Missouri State University. Plaintiffs anticipated completing their master's degree program in December 2000.
In June 2000, the District presented plaintiffs with Probationary Teacher Contracts for the 2000-01 school year. The District did not discuss with plaintiffs any change in their job duties, and as far as plaintiffs knew, they would be employed as Speech Language Implementors during the school year. Plaintiffs signed and returned the Probationary Teacher Contracts in June 2000. At the beginning of the 2000-01 school year, Speech Department head Ms. Brown informed plaintiffs and two other Speech Language Implementors, Kelley Harris and Marcia Hunt, that they would be performing the duties of Speech Language Pathologists, including the screening and diagnosis of students with speech language disorders and development of IEPs for such students. Earlier, in April 2000, Ms. Brown had prepared a memorandum to Gloria King of the District's Human Resources Division, informing *1053 her that plaintiffs and two other Speech Language Implementors should be immediately assigned as Speech Language Pathologists.
The plaintiffs believed they were required to have master's degrees in order to work as Speech Language Pathologists, and at the time had only completed one semester of work toward their master's degrees. Plaintiffs questioned Ms. Brown about whether they were authorized to perform all of the Speech Language Pathologist duties. Ms. Brown told them the District had obtained "provisional certification" from the DESE for them to perform Speech Language Pathologist duties. Plaintiffs performed the duties of Speech Language Pathologists throughout the 2000-01 school year in reliance on Ms. Brown's representation that she had obtained permission from the State of Missouri for them to do so.
Plaintiff Scanlon also asked District employees Pat Wood and Yvonne Tate about her job duties and whether she was authorized to perform those duties. Several times during the school year, plaintiff Scanlon brought her concerns and those of plaintiff Coleman to Ms. Brown, asking whether she was sure it was proper for them to be performing the duties of Speech Language Pathologists. Each time, Ms. Brown responded that "they" had obtained authorization from the State of Missouri. Plaintiff Coleman spoke to Linda Bennett, another District employee, and Ms. Brown, raising her concern about whether she was authorized to perform the duties of a Speech Language Pathologist.
In the fall of 2000, plaintiff Scanlon told Dr. Julie Stierwalt, head of the Distance Education in Speech and Communication Disorders program, that the District was requiring her and others without master's degrees to perform the duties of Speech Language Pathologists. Dr. Stierwalt told Ms. Scanlon she did not believe they should be performing those duties and would look into the matter. On September 29, 2000, Dr. Stierwalt wrote a letter to David Flieg, the District's Director of Human Resources which referred to her students (which included the plaintiffs) working as "implementors" in the District and stated, "I understand that there has been some confusion concerning job titles and supervision requirements." Dr. Stierwalt stated that the "implementors" needed to be supervised in order to obtain academic credit for their work: at least 50% supervision for all evaluation sessions and at least 25% supervision for treatment session. Def.'s Ex. H. Mr. Flieg forwarded the letter to Ms. Brown. Although Ms. Brown knew that plaintiffs were working as Speech Language Pathologists rather than Speech Language Implementors at her direction, she did not respond to Dr. Stierwalt's letter expressing concern over "confusion about job titles."
From August 2000 until late February 2001, plaintiffs were working as Speech Language Pathologists without any supervision of their work. After receiving a copy of Dr. Stierwalt's letter, Ms. Brown sought permission from the District's Executive Director of Special Education, Louise Wilkerson, to hire a Speech Language Pathologist to supervise plaintiffs' performance of their Speech Language Pathologist duties. In February 2001, the District hired Kathi Streiler, who holds a certificate of clinical competence in speech pathology. In the interoffice memorandum introducing Ms. Streiler to the principals at the schools where plaintiffs worked, Ms. Brown represented that "DESE has granted provisional certification to [plaintiffs] ... [and] allowed the District to classify all of them as Speech-Language Pathologists with the stipulation that their programs to obtain a Masters degree are successfully completed no later than December, 2002." Pls.' Ex. 7.
*1054 Ms. Streiler provided some supervision to plaintiffs, but not at the same level they received the previous school year when they worked as Speech Language Implementors. Plaintiffs continued to do screening, diagnosis and IEP development on their own. Shortly after Ms. Streiler was hired, plaintiff Scanlon asked her whether plaintiffs were authorized to work as Speech Language Pathologists. Ms. Streiler replied that Ms. Brown had obtained proper authorization.
Plaintiffs continued to be concerned about their job duties. Plaintiff Scanlon discussed the matter with Dr. Stierwalt again, and talked with Ms. Brown by telephone several times trying to get details about the "provisional certification" Ms. Brown said the District had obtained. Ms. Brown repeatedly insisted that the District had taken care of it.
Late in the school year, plaintiffs met separately with Ms. Brown and the principals of the schools to which they were assigned. These officials told each plaintiff they would recommend her rehiring for the next school year. In early May 2001, Ms. Streiler evaluated plaintiffs' work during the 2000-01 school year and gave each an "A" grade.
Ms. King of the District's Human Resources Division testified that in the late spring of 2001, the Division realized that due to an "error" the District had not obtained certification for plaintiffs and two other Speech Language Implementors to work as Speech Language Pathologists during the 2000-01 school year. Ms. Brown testified that Ms. King told her in late spring 2001 that the District had not obtained provisional certification for the plaintiffs to work as Speech Language Pathologists, and that Ms. King needed to meet with plaintiffs in order to have them sign certain documents in order to obtain provisional certification.
On May 9, 2001, plaintiffs met with Ms. Brown and Ms. King. Ms. King presented plaintiffs with several documents to sign, including Applications for Special Assignment Certification, which plaintiffs filled out as requested, and Probationary Teacher Contracts for the upcoming 2001-02 school year. The reverse side of the Application for Special Assignment Certification quotes DESE regulations which (1) require that an applicant for certification have a minimum of five years work experience in her field (which can be waived under unspecified circumstances), and (2) exclude use of Special Assignment Certifications for elementary and special education teachers.
At the May 9 meeting, plaintiffs again questioned whether the District could lawfully assign them to Speech Language Pathologist duties. Ms. Brown responded that the District had obtained authorization. Plaintiffs asked for the name of a person at DESE who could confirm their status, but Ms. Brown did not give them a name. Plaintiffs asked for written documentation showing they had provisional certification but Ms. Brown refused to produce any. Ms. Brown became visibly upset and told plaintiffs that "the District would not put you in an illegal situation." Neither Ms. Brown nor Ms. King told plaintiffs during the May 9 meeting that there had been an error or oversight; instead they persisted in representing to plaintiffs that the District had obtained authorization for them to work as Speech Language Pathologists for the 2000-01 school year.
Plaintiffs requested that they be assigned to Speech Language Implementor duties but Ms. Brown refused this request. Ms. Brown and Ms. King then told plaintiffs that they would not submit the Applications for Special Assignment Certification to DESE on plaintiffs' behalf unless *1055 plaintiffs agreed to sign a contract that committed them to work for the District for the next five years, three years after they received their master's degrees. Plaintiffs did not sign their Probationary Teacher Contracts at the May 9 meeting, because Ms. Brown and Ms. King were asking for a long-term commitment without satisfactorily explaining plaintiffs' status to them. The deadline for plaintiffs to sign the Probationary Teacher Contracts was May 30, 2001, but this was later extended by Ms. King to June 26, 2001, for plaintiffs and all other probationary teachers who had not signed the contracts.
Following the May 9 meeting, plaintiffs contacted DESE themselves. DESE representatives told plaintiffs that the District had not obtained permission for them to work as Speech Language Pathologists and that plaintiffs "were not in [DESE's] system." Plaintiffs then contacted the State Board of Healing Arts Registration and were told that by continuing to perform Speech Language Pathologist duties without proper licensing they could be violating state law and jeopardizing their ability to obtain licensing in the future.
Plaintiffs were scheduled to work for the District during the 2001 summer school session, for the salary of $4,200. After they talked to DESE and the State Board of Healing Arts Registration, plaintiffs were afraid to continue to work as Speech Language Pathologists during the summer session and were concerned about signing contracts for the next school year. Plaintiffs hired an attorney to advise and represent them in June 2001.
On June 19, 2001, plaintiffs' attorney sent a letter to Dr. Cleveland Hammons, Jr., Superintendent of Schools, protesting the District's apparent false statements about having obtained authorization from DESE for plaintiffs to work as Speech Language Pathologists, requesting documentation of any such authorization, and informing the District they had no choice but to refrain from working as Speech Language Pathologists until such documentation was produced.
On June 25, 2001, Ms. King responded to the letter, stating in part, "In the Fall of 2000, when DESE implemented an alternative certification program known as Special Assignment Classification, [plaintiffs] and others in the same program were reclassified from `Implementor' to `Speech Language Pathologist' (teacher)." Ms. King stated that plaintiffs could have no personal liability for unauthorized practice, as "[c]ertification is strictly an issue between the District and DESE." Finally, Ms. King stated that plaintiffs' employment status was moot, as they had not signed the teacher contract which was due May 30, 2001.
The letter from Ms. King to plaintiffs' attorney did not mention any error or oversight in failing to obtain certification for the 2000-01 school year, and implies that the District had obtained Special Assignment Certification for plaintiffs. The letter incorrectly stated that plaintiffs could not be individually sanctioned for the unauthorized practices of Speech Language Pathology, and failed to recognize that the deadline for plaintiffs to sign their contracts had not yet passed.
The next day, June 26, 2001, plaintiffs sent a letter from their attorney to Ms. King by hand delivery, informing the District that their delay in responding to the offer to renew their contracts was because they needed clarification of the duties they were legally authorized to perform for the District, and that their delay should not be deemed a resignation of their positions. Ms. King did not respond to the letter of June 26.
On June 27, 2001, plaintiffs' attorney sent another letter to Ms. King, seeking clarification and documentation of assertions *1056 made in Ms. King's letter of June 25. The letter of June 27 reiterated that plaintiffs had "not resigned their employment with the District, but require clarification of these issues before they can consider signing contracts for the next school year." Ms. King did not respond to the letter of June 27.
The District has the discretion to accept teacher contracts beyond the specified deadline for returning them. Nonetheless, plaintiff Scanlon received a letter dated June 27, 2001 from a District Human Resource Specialist, terminating her employment. Plaintiff Coleman received a similar letter dated July 19, 2001, terminating her employment. At the beginning of the 2001-02 school year, the District still had a shortage of Speech Language Pathologists, and had job openings for both Speech Language Pathologists and Speech Language Implementors. Ms. Brown testified she would have had no objection to the District continuing to employ plaintiffs during the 2001-02 school year.
During the 1999-2000 school year, the District employed Marcia Hunt and Kelly Harris as Speech Language Implementors. Like plaintiffs, Ms. Hunt and Ms. Harris had recently obtained bachelor's degrees and began work toward their master's degrees in early 2000 through the Distance Learning Program offered by Southwest Missouri State University. The District required Ms. Hunt and Ms. Harris, like plaintiffs, to perform Speech Language Pathologist duties during the 2000-01 school year, although they were not licensed by the State Board of Healing Arts Registration and the District had not obtain certificates from DESE.
Ms. Hunt and Ms. Harris were also offered contract renewals for the 2001-02 school year. They were given deadlines of May 30, 2001 to return their Probationary Teacher Contracts. Ms. Harris' deadline was extended to July 3, 2001, but she did not return her Probationary Teacher Contract until July 9, 2001. The District employed Ms. Harris during the 2001-02 school year although she did not return her Probationary Teacher Contract by either the original or the extended deadline.
The District did not obtain certification for Ms. Hunt and Ms. Harris to work as Speech Language Pathologists during the 2001-02 school year. Ms. King testified there was another "error" made with respect to these individuals' certification. Ms. Hunt and Ms. Harris worked as Speech Language Pathologists during the 2001-02 school year, although they did not have either licenses from the State Board of Healing Arts Registration or teaching certificates from DESE. Ms. Hunt and Ms. Harris completed their master's degrees in December 2002. The District did not obtain any certification from DESE for Ms. Hunt or Ms. Harris to work as Speech Language Pathologists until after they had completed their master's degrees.
Plaintiffs obtained Speech Language Implementor positions at other school districts for 2001-02 and subsequent school years, at lower salaries than they had been offered by the District. When plaintiffs completed their master's degrees in December 2002, the school district for which they then worked reclassified them as Speech Language Pathologists and obtained certification from DESE for them to perform such work. Plaintiffs have never been licensed as Speech Language Pathologists by the State Board of Healing Arts Registration.
Plaintiffs filed this action in November 2002.

Discussion.

A. First Amendment Claim.
Plaintiffs assert in Count I that the Board violated their First Amendment rights by refusing to renew their employment *1057 contracts in retaliation for their conduct in challenging the propriety of the District's conduct in reassigning them from Speech Language Implementor to Speech Language Pathologist positions. The Board moves for summary judgment on this claim asserting that plaintiffs cannot show that: (1) they engaged in constitutionally protected speech, because their speech concerned only their own personal interests or grievances related to employment, or (2) their speech was a substantial or motivating factor in the District's decision to terminate their employment.
A public employee's speech enjoys limited protection under the First Amendment. Day v. Johnson, 119 F.3d 650, 657 (8th Cir.1997), cert. denied sub nom Hollowell v. Johnson, 522 U.S. 1055, 118 S.Ct. 707, 139 L.Ed.2d 649 (1998). The law is clearly established that a public employer cannot discharge an employee if the discharge infringes on the employee's constitutionally protected right to free speech. Kincade v. City of Blue Springs, Mo., 64 F.3d 389, 395 (8th Cir.1995), cert. denied, 517 U.S. 1166, 116 S.Ct. 1565, 134 L.Ed.2d 665 (1996). In order to establish a prima facie case under the First Amendment, a public employee who claims that an employment decision was made in retaliation for protected speech must show that: (1) she was engaged in constitutionally protected speech; (2) she was subjected to an adverse action or was deprived of some benefit; and (3) the protected speech was a substantial or a motivating factor in the adverse action. Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); Campbell v. Arkansas Dept. of Correction, 155 F.3d 950, 958 (8th Cir.1998).
"In reviewing challenges to discharges based on alleged violations of an employee's freedom of speech rights, courts engage in a two-step analysis. We must first determine whether the plaintiff established that he engaged in a protected activity." Tuttle v. Missouri Dept. of Agriculture, 172 F.3d 1025, 1033 (8th Cir.1999) (internal citation omitted). "Speech which is constitutionally protected is that which can be `fairly characterized as constituting speech on a matter of public concern.'" Id. (quoting Connick v. Myers, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). Speech addressing a matter of public concern is speech relating to "any matter of political, social, or other concern to the community." Connick, 461 U.S. at 146, 103 S.Ct. 1684. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147-48, 103 S.Ct. 1684 (footnote omitted). "If an employee's speech is found to involve a matter of public concern, courts must then balance the interest of the employee, as a citizen, with the interest of the state, as an employer. Both of these inquiries involve matters of law for the court to decide." Tuttle, 172 F.3d at 1034 (internal citation omitted).

1. Protected Activity.
Plaintiffs' speech "is not entitled to First Amendment protection unless they addressed matters of public concern." Belk v. City of Eldon, 228 F.3d 872, 878 (8th Cir.2000), cert. denied, 532 U.S. 1008, 121 S.Ct. 1734, 149 L.Ed.2d 659 (2001). The burden is on plaintiffs to establish that their speech pertained to matters of public concern. Mt. Healthy, 429 U.S. at 287, 97 S.Ct. 568. The Board argues that plaintiffs' speech did not address matters of public concern because they were speaking as employees concerning internal practices affecting only their own jobs and job duties and not as concerned citizens, citing Tuttle, 172 F.3d at 1034.
*1058 "When a public employee's speech is purely job-related, that speech will not be deemed a matter of public concern.... Unless the employee is speaking as a concerned citizen, and not just as an employee, the speech does not fall under the protection of the First Amendment." Buazard v. Meridith, 172 F.3d 546, 548 (8th Cir.1999). In Tuttle, for example, the Eighth Circuit held that a grain inspector's conversation with his supervisor concerning recent worker cutbacks, employment policies, possible increases in salaries, promotions and safety issues did not address matters of public concern because the employee was speaking solely as an employee. Tuttle, 172 F.3d at 1034. The question before the Court is whether plaintiffs' statements in this case, which were unquestionably related to their jobs, addressed solely personnel matters or also matters of public concern. See Belk, 228 F.3d at 878.
Plaintiffs' statements and questions to their supervisor Ms. Brown, Ms. King, their professor, and the Superintendent of Schools concerning whether they were qualified to act as Speech Language Pathologists implicated their interests as citizens because they were alleging, in essence, that the District was violating state law and causing them to violate state law by having them, as unauthorized and unqualified persons, provide speech pathology services to schoolchildren.
The plaintiffs' speech should be viewed as what the Sixth Circuit has termed "mixed speech," which is protected although it involves both personal and public matters. See Banks v. Wolfe Co. Bd. of Educ., 330 F.3d 888, 894 (6th Cir.2003). In Connick, the Supreme Court explained that the key question is not whether the person is speaking in his role as an employee or a citizen, but whether the employee's speech in fact touches on a matter of public concern. 461 U.S. at 148-49, 103 S.Ct. 1684. Thus, the "subjective intent of the speaker, while relevant, is not a controlling factor." Banks, 330 F.3d at 894. In Connick, the employee circulated a questionnaire containing fourteen questions to her co-workers. The Court found that one of the fourteen questions involved an issue of public interest, even though in circulating the questionnaire the plaintiff was speaking as an employee motivated by her private interest in opposing her supervisors' decision to transfer her. Id. The fact that one of her questions concerned a constitutional right was sufficient to cause the Court to conclude her speech touched on a matter of public concern. Id.
Similarly, in Stever v. Independent School District No. 625, St. Paul, 943 F.2d 845, 850-51 (8th Cir.1991), the Eighth Circuit held that it was a matter of public concern where a school nurse expressed concern to her supervisor orally and in writing over a lack of nursing space, understaffing, lack of wheelchair access, and failure to immunize students as required by law, even though her speech arose as much from her personal concerns and complaints as well as her interest in student welfare.
The Court concludes that under Connick and Stever, the plaintiffs, although obviously concerned about their own jobs, were raising a matter of public concern. The state legislature has determined that certain educational standards must be met before a person may engage in the practice of speech language pathology, which indicates a degree of public interest. Cf. Stever, 943 F.2d at 851 ("student immunizations were of a degree of public interest sufficient to be required by the state legislature.") The plaintiffs worked with students entitled to speech and language services pursuant to the IDEA. It is a matter of public concern if the District were to provide federally-mandated services to disabled *1059 schoolchildren by means of unqualified or unauthorized personnel.
Directing the Court's attention to the form and context of plaintiffs' speech, the Board points out that plaintiffs voiced their concerns only to their supervisor, their professors, and the Superintendent of Schools, and therefore plaintiffs' statements do not involve matters of public concern. It is well established, however, that "First Amendment protection applies when a public employee arranges to communicate privately with his employer rather than to express his views publicly." Connick, 461 U.S. at 146, 103 S.Ct. 1684 (citing Givhan v. Western Line Consol. Sch. Dist., 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979)). "[T]he fact that a plaintiff made statements in a private conversation about a public official ... does not vitiate the status of [the] statement as addressing a matter of public concern." Belk, 228 F.3d at 879.
Having determined that plaintiffs spoke on a matter of public concern, the Court must balance the employees' interests in speaking on matters of public concern against the "interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Stever, 943 F.2d at 849 (quoting Pickering v. Board of Educ. of Tp. High Sch. Dist. 205, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). This balancing of interests requires consideration of these factors:
(1) the need for harmony in the office or work place; (2) whether the government's responsibilities require a close working relationship to exist between the plaintiff and co-workers when the speech in question has caused or could cause the relationship to deteriorate; (3) the time, manner, and place of the speech; (4) the context in which the dispute arose; (5) the degree of public interest in the speech; and (6) whether the speech impeded the employee's ability to perform his or her duties.
Bowman v. Pulaski Co. Special Sch. Dist., 723 F.2d 640, 644 (8th Cir.1983) (citing Connick, 461 U.S. at 151-54, 103 S.Ct. 1684).
In cases where the public employer cannot demonstrate that the employee's speech disrupted the workplace, however, the court need not proceed to a specific Pickering factor analysis absent exceptional circumstances. Belk, 228 F.3d at 881. In this case, the Board has not even alleged that plaintiffs' speech caused a disruption of District operations. As a result, the Court does not conduct a Pickering analysis because there are no government interests in efficiency to weigh against the First Amendment interests. Id.

2. Substantial or Motivating Factor.
Plaintiffs also bear the burden to establish that their protected speech was a substantial or motivating factor in the District's refusal to renew their employment. See Mt. Healthy, 429 U.S. at 287, 97 S.Ct. 568. The Board moves for summary judgment on plaintiffs' First Amendment claim asserting that they cannot show the protected portion of their speech was causally linked to the non-renewal of their employment.
The issue whether protected speech played a substantial or motivating role in the employment decision is ordinarily an issue of fact for the jury. Graves v. Arkansas Dept. of Fin. and Admin., 229 F.3d 721, 723 (8th Cir.2000). "The sufficiency of the evidence to create an issue of fact for the jury, however, is solely a question of law." Stever, 943 F.2d at 851.
In this case, the Court concludes the evidence is sufficient to create an issue of fact for the jury's determination. The *1060 adverse employment action, failure to renew plaintiffs' contracts, occurred very close in time to the protected speech. Plaintiffs increased the forcefulness of their questions and protests about the District's conduct in May and June 2001, when they asked for written documentation of the District's claim that it had obtained authorization from DESE for them to work as Speech Language Pathologists. When no documentation was provided and plaintiffs learned directly from DESE that no such authorization existed, plaintiffs had an attorney write a letter to the District on their behalf challenging its conduct. Ms. King's written response to the attorney's letter stated that plaintiffs' employment was already terminated, although the deadline for them to return the Probationary Teacher Contracts had been extended. A jury could reasonably infer that it was no accident the District revoked its offers of employment to plaintiffs in late June and mid-July 2001, shortly after they engaged in this protected speech.
The District also reacted negatively to plaintiffs' speech. Plaintiffs have offered evidence that the head of its Speech Department, Ms. Brown, became visibly angry and upset when plaintiff Scanlon asked her for written documentation to support Brown's statement that she had obtained permission from DESE for plaintiffs to work as Speech Language Pathologists. Ms. Brown refused to provide any documentation and told plaintiffs that the District "wouldn't put [them] in an illegal situation." The jury could consider Ms. Brown's reaction and statements relevant to the District's motivation for not renewing plaintiffs' employment contracts. Evidence that an employer has expressed impatience with or antipathy to protected conduct or speech supports an inference that it harbored a retaliatory animus that affected its employment decision. See, e.g., Salitros v. Chrysler Corp., 306 F.3d 562, 569 (8th Cir.2002) (supervisor's negative comment concerning plaintiff's filing of an EEOC charge was relevant to defendant's motivation in firing plaintiff later the same day); Naucke v. City of Park Hills, 284 F.3d 923, 929 (8th Cir.2002) (city administrator's angry reaction to protected speech of employee's wife and his threat to fire plaintiff if he did not quiet his wife was evidence from which the jury could conclude the administrator improperly influenced city government's decisionmaking process in firing plaintiff).
Plaintiffs both had excellent work records during their two-year tenure with the District, earning "A" evaluations at the end of the 2000-01 school year. The District offered them contracts for the following year and pressed them to sign five-year contracts. The District continued to experience a shortage of Speech Language Implementors and Speech Language Pathologists in the 2001-02 school year. The jury might find that the District would not fail to rehire plaintiffs unless it had an ulterior motive, which could reasonably include a desire to punish plaintiffs for speaking out concerning its use of unauthorized Speech Language Pathologists.
Finally, although plaintiffs did not sign and return their contracts for the 2001-02 school year by either the initial or extended deadlines, they made it clear in writing that they did not intend to resign their employment and were only waiting until the issue of their authorization to act as Speech Language Pathologists was resolved. Plaintiffs presented evidence that Ms. Harris, who also worked as a Speech Language Pathologist during the 2000-01 school year, did not return her contract for the 2001-02 school year until after the extended deadline had expired, but the District renewed her contract. Ms. Harris had not spoken out concerning the District's policies about Speech Language Pathologists. *1061 Unequal treatment of similarly situated employees can raise an inference of pretext. See, e.g., Keathley v. Ameritech Corp., 187 F.3d 915, 922-23 (8th Cir.1999) (plaintiff raised issues of pretext where she presented evidence that other sales employees were also late to meetings and had full voice-mail boxes, but were not disciplined as a result).
These points establish that disputed issues of fact remain which preclude the entry of summary judgment on the issue whether plaintiffs' protected speech was a substantial or motivating factor in the District's failure to renew their employment contracts.

B. Substantive Due Process Claim.
Plaintiffs assert in Count II that the District violated their substantive due process rights by refusing to renew their employment contracts because plaintiffs refused to work as Speech Language Pathologists in violation of state law. The Board moves for summary judgment on this claim asserting that plaintiffs cannot show that: (1) they had a protectable property or liberty interest in their continued employment because they were probationary employees, and (2) the District's actions in terminating their employment "shock the conscience."
"[A] substantive due process plaintiff `must demonstrate both that the official's conduct was conscience-shocking, and that the official violated one or more fundamental rights that are "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed."'" Slusarchuk v. Hoff, 346 F.3d 1178, 1181-82 (8th Cir.2003) (quoting Moran v. Clarke, 296 F.3d 638, 651 (8th Cir.2002) (en banc) (Bye, J., concurring and writing for a majority on this issue) (citations omitted)), cert. denied, ___ U.S. ___, 124 S.Ct. 2018, 158 L.Ed.2d 492 (2004).
Any right to substantive due process is no greater than the right to procedural due process. Thus, if a plaintiff is not deprived of a life, liberty or property interest that would support a procedural due process claim, this precludes her from proceeding on a substantive due process theory. Singleton v. Cecil, 176 F.3d 419, 422 (8th Cir.), cert. denied, 528 U.S. 966, 120 S.Ct. 402, 145 L.Ed.2d 313 (1999). "A government employee is entitled to ... due process only when he has been deprived of a constitutionally protected property or liberty interest. Any claim of a property interest in employment must be grounded in state law." Gibson v. Caruthersville Sch. Dist. No. 8, 336 F.3d 768, 772 (8th Cir.2003) (internal citation and punctuation omitted).
"Under Missouri law, `a probationary teacher has a property interest in employment only for the remainder of the school year for which he or she has a contract.' Smith v. King City Sch. Dist., 990 S.W.2d 643, 646 (Mo.App.W.D.1998). Missouri law provides no right to renewal ... and no property interest in renewal arises. Id." Gibson, 336 F.3d at 772. "Probationary teachers in Missouri do not have a property right to continued employment upon which to maintain" an action for denial of due process under 42 U.S.C. § 1983. Berhorst v. Maries County R-II Sch. Dist., 805 S.W.2d 696, 699 (Mo.App.S.D.1991) (citing Derrickson v. Board of Educ. of City of St. Louis, 703 F.2d 309, 314 (8th Cir.1983)).
In this case, plaintiffs signed Probationary Teacher Contracts for the 2000-01 school year. The District did not terminate those contracts, but rather did not renew the contracts for the following school year. Under Missouri law, the *1062 plaintiffs had no right to renewal of their teaching contracts and no property right in renewal. Smith, 990 S.W.2d at 646. Because plaintiffs had no property right in renewal of their contracts, they do not have a substantive due process right which was implicated or violated by the District's failure to renew their contracts. The Board's motion for summary judgment on plaintiffs' substantive due process claim should therefore be granted. As a result, the Court does not address the Board's second contention, that plaintiffs cannot show the District's action in terminating their employment shocks the conscience.

Conclusion.
For the foregoing reasons, the Court concludes that the Board's motion for summary judgment on plaintiffs' First Amendment claims should be denied, and its motion for summary judgment on plaintiffs' substantive due process claims should be granted.
Accordingly,
IT IS HEREBY ORDERED that defendant Board of Education of the City of St. Louis' motion for summary judgment is DENIED in part and GRANTED in part; said motion is DENIED as to plaintiffs' First Amendment claims in Count I and GRANTED as to plaintiffs' substantive due process claims in Count II. [Doc. 20]
An appropriate partial judgment will accompany this memorandum and order.